## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

        **v.**                          **Case Nos.**    **05-20017-01-JWL**
                                                            **05-20017-02-JWL**
**FIDENCIO VERDIN-GARCIA a/k/a**                    **05-20017-05-JWL**
**Fide a/k/a Fidencio Garcia-Verdin, et al.,**           **05-20017-06-JWL**

        **Defendants.**
_____

## MEMORANDUM AND ORDER

       The indictment in this case charges the defendants with seventeen counts of various crimes relating to their alleged distribution and conspiracy to distribute methamphetamine and marijuana. During law enforcement officers' investigation of this matter, they obtained wiretap orders and intercepted telephone conversations. The matter is before the court on the defendants' motions to suppress which are largely directed to the propriety of the evidence obtained by wiretap interceptions. The court held an evidentiary hearing on these motions on October 17, 2005, October 19, 2005, and October 26, 2005. After thoroughly considering the parties' arguments and the evidence, the court is now prepared to rule. For the reasons explained below, the court will deny the defendants' motions to suppress in their entirety.

### DEFENDANT REYNOSO'S MOTION TO SUPPRESS

The first motion before the court is defendant Graciela Reynoso's motion to suppress (Doc. 50).  The indictment charges Ms. Reynoso with conspiring to distribute and possessing with intent to distribute methamphetamine as well as using a communication facility to facilitate a drug trafficking crime on or about September 20, 2004.  It appears to the court that both of these charges arise out of two telephone conversations that monitoring agents intercepted on September 20, 2004, between Ms. Reynoso and defendant Fidencio Verdin-Garcia.  By way of the current motion, Ms. Reynoso asks the court to suppress from evidence in this case the contents of those two intercepted telephone conversations as well as statements that she made to law enforcement officers on November 1, 2004.

**A.      Telephone Conversations Intercepted on September 20, 2004**

The evidence presented at the suppression hearing revealed that law enforcement officers obtained a court order authorizing the wiretap of a cellular telephone referred to as Target Telephone #3.  One of the target subjects of this wiretap order was Mr. Verdin-Garcia, as he was believed to be using that cellular telephone to arrange shipments of drugs to the Kansas City area for distribution.  Law enforcement officers believed that Ms. Reynoso and Mr. Verdin-Garcia were married because they maintained a family home at 3428 Smart Avenue in Kansas City, Missouri.  Mr. Verdin-Garcia also maintained another residence for his drug business, but he lived at the 3428 Smart Avenue address with Ms. Reynoso and their two children.  Ms. Reynoso was the subscriber for Target Telephone #3, but Mr. Verdin-Garcia used the telephone.  Ms. Reynoso also maintained a land line at their family home.  The land

2

line was not wiretapped, but telephone conversations between Ms. Reynoso on the land line and Mr. Verdin-Garcia on the cellular telephone were intercepted pursuant to the wiretap order on the cellular line.  In accordance with the wiretap order on the cellular line, law enforcement officers minimized their interceptions of telephone conversations between Ms. Reynoso and Mr. Verdin-Garcia because they believed that those conversations were privileged marital communications and not pertinent to the investigation in any event.  Monitoring agents would periodically spot check those interceptions to see whether Ms. Reynoso may have given the land line receiver to someone else to discuss criminal matters with Mr. Verdin-Garcia.

The monitoring agents' practice of minimizing (with spot checking) the conversations between Ms. Reynoso and Mr. Verdin-Garcia changed on September 20, 2004.  At approximately 5:45 p.m. that day, monitoring agents intercepted a brief telephone conversation on the wiretapped cellular line in which Diego Gustavo Castro ("Diego") called Mr. Verdin-Garcia ("Fide").  In that conversation, Diego told Fide that he was at Fide's house and Fide told Diego to "give [the money] to my wife."  Diego then told Fide that "the guy was missing half. We weighed it."  When monitoring agents overheard this, they contacted the supervising prosecutor and obtained permission to listen to subsequent conversations between Ms. Reynoso and Mr. Verdin-Garcia.

Only minutes later at approximately 5:48 p.m., Mr. Verdin-Garcia called Ms. Reynoso ("Chela") on their home land line telephone.  He instructed her as follows:

> FIDE:    Listen, Diego is outside.  Tell him to give you the money . . . .  He is waiting for me.

CHELA:          Which old man?

FIDE:           Diego, Diego.

CHELA:          Uh!  Do I tell him to give me the money?

FIDE:           Yeah.  I'm going over there now.

CHELA:          Are you sure he is here?

FIDE:           Yes, he told me he was outside the house.

CHELA:          Oh, yes.  Bye.

FIDE:           Okay, bye.

The next telephone conversation between Mr. Verdin-Garcia and Ms. Reynoso occurred, again, only minutes later at approximately 5:52 p.m.   That conversation proceeded as follows:

FIDE:           Did he give it to you?

CHELA:          Yes.

FIDE:           Did he already leave?

CHELA:          Yeah.

FIDE:           How much did he give you?

CHELA:          Three, five hundred.

FIDE:           All right.

CHELA:          He made me count it in front of him here.

FIDE:           Okay, I'm on my way there.

Ms. Reynoso now asks the court to suppress the contents of these two wiretapped telephone conversations with Mr. Verdin-Garcia on the following three grounds: (1) the conversations were privileged marital communications; (2) government agents failed to minimize the interceptions as required by the court order authorizing the wiretap; and (3) government agents should not have intercepted her telephone conversations because she was not a named or suspected target.[1]   For the reasons explained below, the court finds each of these arguments to be without merit.

### 1.      Marital Privilege

Federal courts recognize two marital privileges.  *United States v. Jarvison*, 409 F.3d 1221, 1231 (10th Cir. 2005).   One, the testimonial privilege, permits one spouse to decline to testify against the other during marriage.   *Id.*    The other is the marital confidential communications privilege which either spouse may assert to prevent the other from testifying to confidential communications made during marriage.   *Id.*   The testimonial privilege is not implicated in this case at this procedural juncture.    Thus, the marital confidential communications privilege is at issue.   As the party asserting the privilege, Ms. Reynoso bears the burden of establishing that the privilege applies.   *Id.*   For the following three reasons, she has failed to meet that burden.

---

[1] Ms. Reynoso also argues that the government failed to offer sufficient facts in support of the wiretap application to support the necessity of the wiretap.   The court will consider this argument in conjunction with Mr. Verdin-Garcia's motion to suppress, as it was the sole argument advanced in support of his motion.   The court does wish to clarify for the record that insofar as Ms. Reynoso has raised this argument in support of her motion to suppress, it is rejected for the same reasons explained below with respect to Mr. Verdin-Garcia's motion.

First, application of the marital communications privilege "depends upon the existence, at the time of the communication in question, of a valid marriage as determined by applicable state law." *United States v. Staggs*, 881 F.2d 1546, 1549 (10th Cir. 1989). Mr. Reynoso did not present any evidence at the suppression hearing that she and Mr. Verdin-Garcia were ever actually married, other than perhaps by virtue of a common law marriage. In fact, Ms. Reynoso stated in her reply brief "that no formal marriage ceremony has ever been performed." The evidence presented at the suppression hearing revealed that the family home where they lived with their two children was located in Kansas City, Missouri. Missouri, however, does not recognize common law marriages. Mo. Ann. Stat. § 451.040(5) ("Common-law marriages shall be null and void."); *Hesington v. Hesington's Estate*, 640 S.W.2d 824, 825 (Mo. Ct. App. 1982) (noting that common law marriages contracted in Missouri after this statute was adopted in 1921 are null and void). Granted, Missouri courts will recognize as valid a common law marriage that is valid where the parties reside. *See Whitley v. Whitley*, 778 S.W.2d 233, 238 (Mo. Ct. App. 1989) (also noting that the proponent of such a marriage must present "stringent proof" to establish the existence of the marriage). But in this case Ms. Reynoso did not establish the validity of the marriage under the law of any other state. Although Ms. Reynoso argued in her reply brief that Ms. Reynoso and Mr. Verdin-Garcia had lived together in Kansas for at least a year and always represented themselves to their family and friends as husband and wife, no evidence was produced to support this argument. In fact, it appears that this argument was based on an erroneous oversight that the family home was actually located in Kansas City, Missouri, rather than Kansas City, Kansas. Thus, Ms. Reynoso is not entitled to the benefit of

any privilege applicable to marital communications because she failed to establish the existence of a valid marriage with Mr. Verdin-Garcia on September 20, 2004. *See, e.g.*, *Staggs*, 881 F.2d at 1550 (upholding trial court's denial of marital communication privilege where no common law marriage existed under state law).

Second, communications made to or in the presence of third parties are not intended to be confidential and are not privileged. *Pereira v. United States*, 347 U.S. 1, 6-7 (1954). In this case, the transcripts of the three intercepted telephone conversations (which was the only evidence of these conversations that was produced at the suppression hearing) indicates that the conversations were not confidential. During all three conversations, Mr. Verdin-Garcia was overheard speaking to a third person who was apparently with him. Just before his first phone conversation with Diego, the transcript states that while the phone was ringing, "FIDE: [ASIDE: [U/I]." In other words, Mr. Verdin-Garcia was heard making an unintelligible aside remark to another person. In the next call, which was the first call to Ms. Reynoso, before she said "Hello," he said: "[ASIDE: [U/I] is leaving. Tell him to go and pick it up.]" Again, then, he made another aside remark to someone who was apparently with him. Lastly, in the third telephone call, while the phone was ringing before Ms. Reynoso picked up her phone, he said: "[ASIDE: I'll tell him to go there now. We have gotten everything really fast and [U/I].]" Thus, again, he was making an aside remark to someone who was with him. Because of the presence of this third party, then, these intercepted calls did not consist of the type of *confidential* marital communications that are subject to marital privilege. *See, e.g.*, *United States v. Taylor*, 92 F.3d 1313, 1331-32 (2d Cir. 1996) (holding the district court

correctly admitted into evidence a recording of a telephone conversation between the defendant and his wife where the judge found that other people were present because an aside remark to someone else was heard on the tape).

Third, the Tenth Circuit has adopted a crime-fraud exception to the marital communications privilege. *United States v. Neal*, 743 F.2d 1441, 1446-47 (10th Cir. 1984). Under this exception, "conversations between husband and wife about crimes in which they conspire or participate . . . are not privileged marital communications for the purpose of protection as confidential marital communications." *Id.* at 1447. While the state of the law on this issue is somewhat unclear in light of the split nature of the Tenth Circuit's opinion in *Neal*,[2] the court notes that "[e]very circuit that has considered the [what the Tenth Circuit in *Neal* also alluded to as the] partners in crime exception to the marital confidential communications privilege has adopted it in one form or another." *United States v. Evans*, 966 F.2d 398, 401 (8th Cir. 1992); *see also United States v. Parker*, 834 F.2d 408, 411 (4th Cir. 1987) (noting general agreement with the principle that the confidential marital communications privilege does not apply where marital communications have to do with the commission of a crime in which both spouses are participants); *see also, e.g.*, *United States v. Vo*, 413 F.3d 1010, 1017 (9th Cir. 2005) (marital communications privilege does not apply to statements made in furtherance of joint criminal activity); *Evans*, 966 F.2d at 401 (same,

---

[2] The court need not delve into this issue too deeply given Ms. Reynoso's failure to establish the existence of a valid marriage or the confidentiality of the communications in any event.

limiting the exception to conversations involving patently illegal activity); *United States v. Sims*, 755 F.2d 1239, 1243 (6th Cir. 1985) (same).  Suffice it to say that this court is satisfied that under any of the various standards articulated by the Tenth Circuit or the other Courts of Appeal, the two intercepted telephone conversations at issue here would fall within this exception to the confidential marital communications privilege.  Mr. Verdin-Garcia was talking with Diego about drugs, then just minutes later he called Ms. Reynoso and told her to go outside and accept what the court infers from the totality of the circumstances to be drug money from Diego.  She did not question the directive, but instead willingly and without hesitation went outside, accepted the money from Diego, and counted it.  Thus, these conversations revealed that they were at that time conspiring and jointly participating in the patently illegal criminal activity of selling drugs.  As such, those communications are not privileged.

### 2.    Minimization

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 requires that wiretapping or electronic surveillance "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception."  18 U.S.C. § 2518(5). In evaluating the sufficiency of monitoring agents' efforts to minimize interceptions, the court must decide whether the steps taken by agents to minimize the interception of communications unrelated to the investigation were objectively reasonable under the circumstances.  *Scott v. United States*, 436 U.S. 128, 137 (1978).  Whether monitoring agents conducted the wiretap

in such a manner depends on an evaluation of the facts and circumstances of each case. *Id.* at 139-40; *United States v. Killingsworth*, 117 F.3d 1159, 1165 (10th Cir. 1997).

In this case, the court is satisfied that monitoring agents' efforts to minimize what they believed to be non-pertinent, privileged phone calls between Ms. Reynoso and Mr. Verdin-Garcia were imminently reasonable.   Case agent Shawn Buck testified that monitoring agents would minimize (i.e., not listen to) the intercepted phone calls between Mr. Verdin-Garcia on his cellular line and Ms. Reynoso on the land line at the family home.   They would periodically spot check those conversations to see whether Ms. Reynoso was still talking to Mr. Verdin-Garcia or whether she may have handed the phone to someone else because in this particular investigation phones were often handed around to various people during conversations.   If the spot check revealed that Ms. Reynoso was still on the phone, then they would minimize the interception again.   Monitoring agents did not believe that the land line at the house was used primarily for marital communications because drug transactions often took place at the residence and other members of the alleged conspiracy were in and out of the house.   But Officer Buck testified that he "can without a doubt guarantee" that monitoring agents did not listen to phone conversations between Ms. Reynoso and Mr. Verdin-Garcia before September 20, 2004.   The court does not doubt the veracity of his testimony on this issue.   The evidence presented at the suppression hearing revealed that Ms. Reynoso was generally aware of Mr. Verdin-Garcia's involvement with drugs but, to the best of her knowledge and ability, did not tolerate such activity at the family home.   Presumably, the only evidence of her involvement in his drug business is when she went outside and took the money from Diego on September

20, 2004.  Her involvement in the business was so minimal that agents did not intend to arrest her when they went to her house on November 1, 2004.  They only arrested her on that date because they were instructed to do so at the last minute based on immigration violations.  Thus, monitoring agents undoubtedly had little interest in her conversations with Mr. Verdin-Garcia until September 20, 2004.  In fact, the evidence revealed that up until the call when Mr. Verdin-Garcia told Diego to give the money to Ms. Reynoso, monitoring agents determined that four telephone calls earlier that day at 4:40 p.m., 4:41 p.m., 4:43 p.m., and 5:25 p.m. from the wiretapped cellular line to the land line at the family home were "non-pertinent."   In other words, they were minimized.  Ms. Reynoso failed to submit any persuasive evidence to suggest that monitoring agents could have more effectively minimized their interceptions of her phone calls with Mr. Verdin-Garcia.

Thus, it appears that the sole impetus for non-minimization of the phone calls between Mr. Verdin-Garcia's cell phone and Ms. Reynoso's home telephone was Mr. Verdin-Garcia's instructions to Diego to give the money to Ms. Reynoso.  Once the case agent learned of this conversation, he obtained authorization from the supervising attorney to listen to the next phone call between Mr. Verdin-Garcia and Ms. Reynoso.  Thus, monitoring agents had an objectively reasonable belief that it was permissible for them to listen to those intercepted calls.   Moreover, the supervising attorney's instructions in this respect appear to have been objectively reasonable based on the crime/fraud exception to the confidential marital communications privilege.   At the time monitoring agents first listened to phone calls between Mr. Verdin-Garcia and Ms. Reynoso, they believed the conversations would reveal Ms.

11

Reynoso's involvement in the criminal enterprise at which the wiretap warrant was directed. Thus, the court cannot find that under the facts and circumstances of this case monitoring agents acted unreasonably by not minimizing their interceptions of those non-privileged conversations. Accordingly, Ms. Reynoso is not entitled to suppression of these phone calls on the grounds that law enforcement officers unreasonably failed to minimize their interceptions of those telephone calls.

**3.     Unnamed Interceptees**

Ms. Reynoso's argument that the court should suppress the contents of these telephone conversations because she was not a named interceptee in the wiretap order is entirely unpersuasive. In support of this argument, she relies on *United States v. Kahn*, 471 F.2d 191 (7th Cir. 1972), for the proposition that Ms. Reynoso was not a person who was "unknown" and therefore should have been identified by the government in its wiretap application. The Seventh Circuit's opinion in *Kahn*, however, was reversed by the Supreme Court on precisely this point of law. The Supreme Court held that "Title III requires the naming of a person in the application or interception order only when the law enforcement authorities have probable cause to believe that that individual is 'committing the offense' for which the wiretap is sought." *United States v. Kahn*, 415 U.S. 143, 155 (1974). In *Kahn*, it was undisputed that the government had no reason to suspect the defendant's wife before the wire interceptions began and therefore she was among the class of persons "as yet unknown" covered by the wiretap order. *Id.* Likewise, here, there is no evidence to suggest that law enforcement agents suspected Ms. Reynoso of being involved in Mr. Verdin-Garcia's drug business before wire

interceptions began, or in fact up until 5:45 p.m. on September 20, 2004.  As such, like the wife at issue in *Kahn*, Ms. Reynoso was among the class of persons "as yet unknown" covered by Judge VanBebber's wiretap order in this case.  Accordingly, Ms. Reynoso's motion to suppress is denied with respect to the two telephone conversations between her and Mr. Verdin-Garcia on September 20, 2004.

**B.**   **Statements Made to Law Enforcement Officers on November 1, 2004**

On November 1, 2004, law enforcement officers approached Ms. Reynoso outside her residence.  After determining that she did not speak English, they summoned an interpreter to translate.  The translator arrived, went over a consent to search form with Ms. Reynoso, and she signed the form.  While they were searching her residence, they interviewed her.  She told officers that she knew her husband (meaning Mr. Verdin-Garcia) dealt narcotics but she did not allow drugs in the house.  She stated that he kept an apartment off Minnesota Avenue in Kansas City, Kansas, where she believed he conducted most of his drug transactions.  She provided them with further information concerning his drug trafficking activities and associates.  After Officer Smith completed the interview with Ms. Reynoso, he was instructed to place her under arrest for immigration violations.  Ms. Reynoso now asks the court to suppress those statements (which exonerated herself but implicated her husband and others in drug trafficking offenses) on the grounds that she was not first warned about her Fifth Amendment rights, nor did she knowingly and voluntarily waive those rights.[3]

---

[3] Ms. Reynoso's motion to suppress only raises a Fifth Amendment argument in this respect, not a Fourth Amendment argument.  The court will confine its analysis accordingly.

Police officers are not required to administer *Miranda* warnings to everyone they question. *United States v. Rogers*, 391 F.3d 1165, 1169 (10th Cir. 2004). Rather, *Miranda* protections "only apply when an individual is subject to custodial interrogation." *Id.* (quotation omitted). A person is "in custody" for *Miranda* purposes if his or her "'freedom of action is curtailed to a degree associated with formal arrest.'" *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)). The determination of whether a person is "in custody" is based on how a reasonable person would understand the situation. *Id.* "This reasonable person does not have a guilty state of mind and does not have the peculiar mental or emotional conditions that are not apparent to the questioning officer." *Id.* (quotation omitted).

Task Force Officer William Michael Smith testified that Mr. Verdin-Garcia was arrested on November 1, 2004. Officer Smith was assigned to perform surveillance of the residence on Smart Avenue. He was to approach the occupants with his goal being to obtain consent to search the residence. He and other law enforcement officers performed surveillance until they observed the occupants exit the residence. Ms. Reynoso came out of the house and was fastening her child into a car seat as Officer Smith pulled up in front of the residence in his truck. He parked in the street in a manner that did not block in her vehicle and approached her. He identified himself as a police officer, asked her to get out of the van, and quickly determined that he needed the assistance of a translator in order to communicate with her. He called law enforcement officer Luis Ortiz to act as a translator.

While they were waiting for Officer Ortiz to arrive, the law enforcement officers waited in the driveway with Ms. Reynoso. She was not in handcuffs. They did not tell her that she had

14

to stay.  She did not attempt to leave or get back in her car.  Officer Smith testified that Ms. Reynoso did not appear scared by his presence.  At that time, Officer Smith did not intend to arrest Ms. Reynoso.  Rather, he had been charged with the task of obtaining consent to search the residence.

Officer Ortiz went directly to the scene, but it took him about twenty minutes to get there.  When he arrived, approximately 3-5 plain clothes officers were on the scene.  He testified that he presumed these officers had weapons but, if they did, they were not displayed or prominent.  He stated that when he arrived all of the officers and the civilians at the scene were calm.  Specifically, he testified that Ms. Reynoso was "very calm and didn't appear nervous."  She remained calm the entire time and was cooperative.  Officer Smith explained to Officer Ortiz that they were conducting a narcotics investigation and Officer Ortiz began translating.  Ms. Reynoso was asking what this was all about, and Officer Ortiz explained to her that "this is all drug related – all about her husband and his involvement in selling drugs."  He explained to her that her husband had been arrested earlier that day.  Ms. Reynoso read the consent form out loud and Officer Ortiz explained it to her.  After she signed the form, she invited the officers inside and told them they could search the house and that they would not find any narcotics, money, or weapons inside the house.

While officers were searching the house, she sat and talked with Officers Smith and Ortiz.  Ms. Reynoso explained that her husband kept an apartment in Kansas City, Kansas, and that the types of things they were looking for would be found there, where his transactions took place.  She stated that she would not allow that type of thing in her house.  She provided the

names of some of the associates that her husband worked with in the drug business.   During Officer Ortiz's presence at the scene, no one ever told Ms. Reynoso that she was under arrest, handcuffed her, or told her she could not leave.   Officers did not have their guns drawn.

At the end of the interview, Ms. Reynoso provided information for a DEA Form 202. As Officer Smith was obtaining information for the Form 202, he learned that Ms. Reynoso was born in Mexico.   Another one of the officers present at the location called the case agent, Shawn Buck, and communicated that to him.   After the interview, officers were preparing to leave when Officer Smith received a cellular phone call from Officer Buck.   In that phone call, Officer Buck instructed Officer Smith to arrest Ms. Reynoso on pending INS charges.   That was the first time Officer Smith had heard anything about arresting Ms. Reynoso on that day. By that time, the search of the home and the interview of Ms. Reynoso were complete.   Officer Smith had never previously indicated to Ms. Reynoso that she was under arrest.   He explained that "we don't arrest every person that has illegally entered the United States that we contact and so it wasn't until I was contacted by [agent Buck] and told by him to arrest her that my intent was ever to detain or arrest her."   Ms. Reynoso released her child to another family member and she was then placed under arrest.

Officer Buck did not recall specific details about why he had instructed Officer Smith to arrest Ms. Reynoso, but he recalled that there had been phone calls intercepted leading up to the day of the arrests in which individuals had been talking about leaving the Kansas City area.   He explained that law enforcement officers did not attempt to obtain a search warrant for the house because there were no drug transactions taking place at the house at that time.

Based on this evidence, the court concludes that a reasonable person in Ms. Reynoso's position would not have believed she was in custody at the time she made the statements that she now seeks to suppress. Officers waited for her to exit her home before approaching her. They were patient, waiting twenty minutes in the driveway for the interpreter to arrive without making any attempt to restrain her freedom. Once the interpreter arrived, Officer Smith was respectful inasmuch as he was honest with her about why he was there and took time to obtain her consent to search the residence. She was compliant with their requests, inviting them into her home and answering their questions candidly. A consideration of the totality of the circumstances surrounding the officers' questioning of Ms. Reynoso demonstrates that no reasonable person in her situation would have felt that her freedom of action was restrained to a degree associated with formal arrest. Thus, she was not "in custody" so as to invoke the requirement that *Miranda* warnings be given. *See, e.g.*, *Rogers*, 391 F.3d at 1170-71 (suspect was not in custody for *Miranda* purposes where the encounter took place in his home and officers were courteous and non-threatening); *United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir. 1994) (same, where the encounter took place in his home and agents never held him at gunpoint, handcuffed him, or otherwise used force or threat of force).[4]

## DEFENDANT VERDIN-GARCIA'S MOTION TO SUPPRESS

---

[4] Ms. Reynoso's contention that she was, "for all practical purposes, arrested the moment she got out of her vehicle and came in contact with the police," is without any evidentiary support. She chose not to testify at the suppression hearing. As such, the officers' testimony that the encounter was relatively unobtrusive stands uncontroverted.

Defendant Verdin-Garcia asks the court to suppress all evidence obtained through wiretap warrants on the grounds that the government failed to meet the requirement of showing necessity with respect to each of the three wiretap orders.  In order to obtain a wiretap pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, the government must follow special procedures set forth in 18 U.S.C. §§ 2510-2522.  *United States v. Small*, 423 F.3d 1164, 1172 (10th Cir. 2005).  One of these statutory requirements is that the government must present a written application to a federal judge establishing that the wiretap is necessary. 18 U.S.C. § 2518(1); *Small*, 423 F.3d at 1172.  The judge must find that the affidavit establishes necessity by showing that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c); *accord Small*, 423 F.3d at 1172 (quoting the statute).  Traditional investigative techniques include standard visual and aural surveillance, questioning and interrogation of witness or participants, use of search warrants, infiltration by undercover agents or informants, pen registers, and trap and trace devices.  *United States v. Cline*, 349 F.3d 1276, 1280 (10th Cir. 2003).  If the government has not tried those traditional techniques, it must explain that failure with particularity.  *Id.*  Generalities, or statements in the conclusory language of the statute, are insufficient to support a wiretap application; the statements must be factual and they must specifically relate to the individuals being targeted by the wiretap.  *Id.* at 1280-81.  The court must consider all the facts and circumstances and read the necessity requirement in a common sense fashion, *id.* at 1281, rather than hypertechnically, *Smart*, 278 F.3d at 1172.  A defendant bears the burden of proving that a

wiretap is invalid once it has been authorized. *United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 (10th Cir. 2002).

**A.**     **First Wiretap Application: Target Telephone #2**

The court is satisfied that the affidavit submitted in support of the first wiretap application satisfied the statutory necessity requirement. This wiretap application applies to Target Telephone #2. The affidavit is thirty-nine pages in length and describes in detail the target subjects and the background of the investigation. It describes pertinent telephone calls intercepted pursuant to a California state wiretap order. It also describes the traditional investigative techniques that had already been undertaken which had uncovered what law enforcement officers believed to be a large-scale drug trafficking organization which was importing drugs from Mexico into the United States.

The affidavit explained the physical surveillance that the investigative team had conducted in February, March, April, and May of 2004. It explained that the target subjects had become evasive and unusually cautious in their movements, thereby threatening the discovery of surveillance. Law enforcement officers became concerned that further physical surveillance would compromise the investigation due to counter surveillance tactics conducted by members of the organization. Moreover, the affidavit explained the limitations of surveillance activities inasmuch as mere observations generally do not prove the purpose of meetings and other activities. The affidavit further explained that it was anticipated that surveillance activities would be effective if used in conjunction with wire interception.

19

The affidavit explained the results of questioning and interrogation of participants in the organization by law enforcement officers.   For example, it described the results of interrogation of a witness in Tennessee who agreed to cooperate with law enforcement officers.   It also described the information learned following a vehicle stop in Beaver, Utah. Additionally, it described evidence learned through interviews with two individuals in May of 2004.   The affidavit explained that, although interviews with drug traffickers and their customers are generally productive, interviews of members of the organization could jeopardize the investigation.

The affidavit explained the perceived risk that a search warrant would expose the investigation prematurely, causing the target subjects to flee the country or drastically change their operations.   Moreover, search warrants would only identify persons at particular locations and would not help reveal the identity of the members of the organization or the full scope of the drug trafficking activities.

The affidavit stated that in order for the goals of the investigation to be met, a confidential source and/or undercover agent would be required to gain the confidence of and access to the target subjects and to be made privy to their criminal activity.   The affidavit explained that this was not likely to be feasible primarily because of the close-knit relationships among high-ranking members of such large-scale narcotics trafficking organizations combined with the compartmentalization of major drug trafficking organizations such that lower-ranking members of the organization often have little or no interaction and do not know each other.   And, the affidavit explained that single undercover purchases would not

develop sufficient information about the organization and continued large-scale purchases would not be feasible.

The affidavit explained that a pen register/trap and trace device had been authorized and installed on Target Telephone #1 in April of 2004. It explained the results of the analysis completed of that device and that law enforcement officers believed that Mr. Verdin-Garcia had "dropped" Target Telephone #1 in an attempt to evade law enforcement detection of his drug trafficking activities. In May of 2004, a second pen register/trap and trace device was authorized for Target Telephone #2. The affidavit also explained the results of an analysis completed on August 4, 2004, for Target Telephone #2.

Based on the contents of the affidavit, the court is satisfied that considering all of the facts and circumstances it provides an adequate showing of necessity for the issuance of the wiretap for Target Telephone #2. The affidavit is not conclusory. It contains sufficient factual details explaining the traditional investigative techniques and why further use of those techniques would be futile. The affidavit indicates that this was a drug organization consisting of numerous individuals and large quantities of drugs. Law enforcement officers had already questioned and interrogated individuals when the opportunity arose and had utilized a pen register/trap and trace device prior to issuance of the wiretap order. Continuous surveillance could not be conducted due to the risk of the investigation being detected. Similarly, a search warrant would have blown the cover of the investigation without providing much fruitful evidence with respect to the operation as a whole. A confidential source was unavailable and utilizing an undercover agent was not feasible given the nature of the organization. Given the

factual background of the investigation, the court is satisfied that normal investigative procedures were tried and failed or reasonably appeared to have been unlikely to succeed if tried.   Thus, issuance of the wiretap order was warranted in order to effectively penetrate this drug trafficking organization.   *See, e.g.*, *United States v. Iiland*, 254 F.3d 1264, 1268 (upholding district court's rejection of the defendant's necessity challenge where specific evidence presented by the government showed that the wiretaps were necessary to develop the full scope and breadth of the drug conspiracy).

**B.**     **Second Wiretap Application: Target Telephone #3**

The second wiretap application was much the same as the first, except that it pertained to Target Telephone #3 and contained updated information.   It explained that Mr. Verdin-Garcia had formerly used Target Telephone #1 and Target Telephone #2.   But, he was believed at that time to be using Target Telephone #3 to arrange shipments of drugs to the Kansas City area for distribution.   It provided detailed information obtained from calls intercepted between Target Telephone #2 and Target Telephone #3 pursuant to this court's first wiretap authorization.   It stated that a pen register/trap and trace device was previously authorized for Target Telephone #3.   Furthermore, it explained the pen register analyses for both Target Telephone #2 and Target Telephone #3.   The affidavit described surveillance efforts that had been undertaken since the prior application in August of 2004.   It also explained that interception of wire communications over Target Telephone #3 was necessary to learn more about the organization. It explained that although interceptions from Target Telephone #2 had been productive, those interceptions provided information on only one small section of the organization.   It was

thought that interception of communications over Target Telephone #3 would give agents knowledge to attempt to intercept drugs and money.

For essentially the same reasons stated above with respect to the first wiretap application, the court is satisfied that considering all of the facts and circumstances the affidavit for the second wiretap application provides an adequate showing of necessity for the issuance of the wiretap for Target Telephone #3. Again, the affidavit is not conclusory and contains sufficient facts to satisfy the court that normal investigative procedures had been tried and had failed or reasonably appeared to have been unlikely to succeed if tried. Thus, issuance of the second wiretap order was warranted.

**C.**      **Third Wiretap Application: Target Telephone #4**

Lastly, the third wiretap application was, again, much the same as the first and second, except that it pertained to Target Telephone #4 and, again, contained updated information. It described information obtained from pertinent calls intercepted from Target Telephone #3 in September of 2004 pursuant to this court's second wiretap authorization. It stated that a pen register/trap and trace device had previously been authorized for Target Telephone #4 and explained the pen register analysis for Target Telephone #4. The affidavit explained the surveillance efforts that were undertaken in September of 2004. It explained that other wire interceptions indicated that Mr. Verdin-Garcia believed he was being followed, and again reiterated that the case agent believed further physical surveillance without wire intercepts could compromise the investigation due to counter surveillance tactics conducted by members of the organization. The affidavit explained that the continued interception of wire

23

communications of target subjects over Target Telephone #3 coupled with interceptions from Target Telephone #4 was necessary to try to positively identify individuals within the organization.

Again, as with the first and second wiretap applications, the court is satisfied that considering all of the facts and circumstances the affidavit for the third wiretap application provides an adequate showing of necessity for the issuance of the wiretap for Target Telephone #4. Once again, the affidavit is not conclusory and contains sufficient facts to satisfy the court that normal investigative procedures had been tried and had failed or reasonably appeared to have been unlikely to succeed if tried. Thus, issuance of the third wiretap order was warranted.

**D.**     **<u>Incorporation of Prior Wiretap Applications</u>**

Mr. Verdin-Garcia emphasizes that each wiretap application must separately satisfy the statutory necessity requirement, citing *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1115 (9th Cir. 2005), and *United States v. Small*, 229 F. Supp. 2d 1166, 1183 (D. Colo. 2002). While this might be correct as legal proposition, in this case each wiretap application *did* satisfy this requirement. Presumably Mr. Verdin-Garcia's argument in this regard rests on the fact that the applications are nearly identical, with the second and third simply adding updated information. Certainly, the government may not move swiftly from wiretap to wiretap. *United States v. Garcia*, 232 F.3d 1309, 1315 (10th Cir. 2000). But the government is not necessarily under an obligation to repeat each form of investigation between each wiretap. *Id.* Rather, the government must "pause to consider whether normal investigative procedures could

be used effectively, particularly in light of any evidence obtained as a result of each succeeding wiretap." *Id.*

In this case, much like in *Garcia*, the government appropriately paused before seeking the subsequent wiretaps.  In each case, they ran pen register/trap and trace devices and analyses of the results of those devices.  The simple fact is that not much appeared to have transpired with the progress of the investigation between the intervening time periods.  *See, e.g.*, *id.* (even though many of the same facts were offered in support of the prior wiretap application, the nature of the investigation had not changed much).  The first wiretap order was issued on August 16, 2004.  The second was issued only a few weeks later on September 9, 2004, and the third and final wiretap order was issued only a month later on October 6, 2004.  Less than two months lapsed between issuance of the first and the third wiretap orders, not much had transpired in the course of the investigation during the interim, and hence logically the applications were factually similar.  In this respect, the court notes that this case is like the wiretap applications at issue in *United States v. Cline*, 349 F.3d 1276 (10th Cir. 2003).  In *Cline*, the Tenth Circuit reviewed the propriety of eight wiretap orders, some of which involved different monitoring periods and thus must have been subsequent applications.  *Id.* at 1281-83 & n.2.  The court noted that all of the challenged affidavits were very similar, and addressed them collectively, pointing out the differences between them.  *Id.* at 1281.  The court concluded, just as this court has concluded with respect to the wiretap applications at issue in this case, that the wiretap applications were far from conclusory and contained sufficient factual details explaining the traditional investigative techniques used and why any future use

of them would likely be fruitless.  *Id.* at 1283.  Law enforcement officers are not required to exhaust all other conceivable procedures before resorting to wiretapping.  *United States v. Iiland*, 254 F.3d 1264, 1268 (10th Cir. 2001).  In this case, each of the wiretap applications revealed that several prior investigatory methods had been tried with little success.  Accordingly, the court rejects Mr. Verdin-Garcia's argument in this regard.[5]

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Graciela Reynoso's Motion to Suppress with Suggestions (Doc. 50) is denied.

**IT IS FURTHER ORDERED** that the Motion of Defendant Verdin-Garcia to Suppress Evidence Obtained Through Wiretap Warrants (Doc. 63) is denied.

**IT IS SO ORDERED** this 23rd day of November, 2005.

 s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

---

[5] Mr. Verdin-Garcia's argument regarding attachment of the California and Missouri wiretap applications is misplaced.  The application does not suggest that these other wiretap applications were being attached in order to satisfy the statutory requirement of establishing necessity.  Rather, they were offered to comply with Title III's statutory requirements.  18 U.S.C. § 2518(1)(e) (each wiretap application must inform the issuing court of all previous applications for interception of wire, oral, or electronic communications involving any of the same persons specified in the pending application).