IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 05-20017-01-JWL |
| | ) |
| FIDENCIO VERDIN-GARCIA, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

# DEFENDANT'S REPLY TO GOVERNMENT RESPONSE TO DEFENDANT'S MOTION FOR SENTENCE REDUCTION PURSUANT TO AMENDMENT 782

To resolve Mr. Verdin-Garcia's motion for a retroactive sentencing reduction, the Court will take two steps.[1] The first is to determine whether Mr. Verdin-Garcia is eligible for a sentence reduction. This is

---

[1] *United States v. Battle*, 706 F.3d 1313 (10th Cir. 2013) (Section 3582(c)(2) prescribes a two-step process. First, a district court must "determine the prisoner's eligibility for a sentence modification and the extent of the reduction authorized." *United States v. McGee*, 615 F.3d 1287, 1292 (10th Cir.2010) (quotation omitted). If a reduction is authorized, the court may "consider any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by reference to the policies relevant at step one is warranted in whole or in part under the particular circumstances of the case.").

not a matter of dispute. The parties agree that the amended guideline range pursuant to Amendment 782 is 360-life at level 36, criminal history category I.[2] The second step is to determine whether the Court will exercise its discretion to grant a reduction. We believe the Court should reduce Mr. Verdin-Garcia's sentence to 360 months.

First, Mr. Verdin-Garcia was sentenced under what history has recognized as an unduly punitive regime. The Department of Justice, the Sentencing Commission, and other stakeholders in the federal criminal justice system have concluded that the penalties prescribed by the 1986 Anti-Drug Abuse Act disserve the penological goals of the Sentencing Reform Act. As the Chair of the Sentencing Commission recently argued,

> [w]ith a generation gone by since the current federal sentencing structure was put into place, and much experience and data now to guide us, we are overdue as a society and as a federal criminal justice community to reconsider our approach to federal drug sentencing.[3]

---

[2] See Response to Defendant's Motion to Reduce Sentence, Document 382, at 4.

[3] Honorable Patti B. Saris—Chair, United States Sentencing Commission, Chief United States District Judge for the District of Massachusetts, A Generational Shift for Federal Drug Sentences, 52 American Criminal Law Reporter 1, 12 (2014) available here.

The Department of Justice has noted the same problem.[4]

A brief history of our federal drug laws may help explain how we arrived at this juncture. It was 1986, and the House Judiciary Committee was debating the Anti-Drug Abuse Act. Mr. Eric Sterling was counsel for the Committee, which was drafting a bill to dramatically escalate drug distribution sentences. The Committee faced the question of what quantities of drugs marked kingpins from minor dealers. So Mr. Sterling called the DEA and asked their opinion. He explains what happened next.

> So the DEA came up with numbers to define high-level trafficking, but a congressman from Kentucky said he would never be able to use the law because they didn't have trafficking that high in his area. So we needed new numbers. Nobody stopped to say, "But Louisville isn't Miami or Hollywood or New York. You should be lucky you don't see this in Louisville." Suddenly, these numbers just wouldn't work — we needed "better" numbers. So I called a very respected narc named Johnny St. Valentine Brown, whose nickname was

---

[4] Eric Holder, Remarks at the Annual Meeting of the American Bar Association's House of Delegates, August 12, 2013, available here. (Mandatory minimum sentences in drug cases "have had a destabilizing effect on particular communities, largely poor and of color. And, applied inappropriately, they are ultimately counterproductive.")

Jehru, to detail to the committee what the numbers should be on minimum trafficking violations.[5] Though Mr. Sterling had no way to know, Mr. St. Valentine-Brown was a very poor choice for the task of setting the drug quantity levels in the 1986 Anti-Drug Abuse Act that have determined mandatory minimum sentences (and the resulting guideline sentences, which have been pegged to mandatory minimums)[6] for the last twenty-nine years.[7]

Mr. St. Valentine-Brown was a D.C. narcotics officer. He was also "a very good liar."[8] After helping Congress set the drug quantity levels for mandatory minimum sentences that still largely exist today, Mr. St. Valentine Brown was convicted of perjury after it was discovered that

---

[5] Jonathan Easley, The Day the Drug War Really Started, Salon Magazine, June 19, 2011, available here.

[6] United States v. Kimbrough, 552 U.S. 85, 97 (2007) (The Supreme Court has long recognized that the Sentencing Commission did not use an "empirical approach in developing the Guidelines sentences for drug-trafficking offenses. Instead, it employed the 1986 Act's weight-driven scheme. The Guidelines use a drug quantity table based on drug type and weight to set base offense levels for drug-trafficking offenses.")

[7] Id. ("Anyway, there was no conversation to determine if crack was even more dangerous than cocaine, or what quantity a mid-level crack dealer might carry in comparison to a mid-level cocaine dealer. It was a seat-of-the-pants judgment from this one narc about what the drug trade in one part of the country might have looked like at that moment in time.")

[8] Jason Cherkis, False Witness, Washington City Paper, July 21, 2000, available here; Bill Miller, Ex-Officer Faces Contempt Charge; Former D.C. Detective Falsified Letters, Prosecutors Allege, Washington Post, January 21, 2001, available here.

he had lied time and again about his qualifications to testify.[9] Before sentencing in his perjury case, Mr. St. Valentine-Brown submitted a number of letters attesting to his good character. These letters were forgeries. He pled guilty, again, to obstruction of justice. This twice-convicted liar is the person that devised the quantity calculations that still set federal mandatory minimums and the guidelines tied thereto in drug cases.[10]

Mr. St. Valentine-Brown's sentencing scheme has not worked well. It has: (1) endangered public safety by driving prison overcrowding, which has significantly reduced inmate access to programs necessary to reduce recidivism and, (2) incarcerated inmates long after they pose a risk to the public. Each problem will be considered in turn.

---

[9] *United States v. Gale*, 314 F.3d 1 (D.C. Cir. 2003) ("Johnny St. Valentine Brown for years testified as an expert witness for the government in narcotics cases. But it later developed that Brown was something of a con man himself, so much so that he was charged with and pleaded guilty to having committed perjury about his educational background.")

[10] Easley, at fn 1 ("So I called a very respected narc named Johnny St. Valentine Brown, whose nickname was Jehru, to detail to the committee what the numbers should be on minimum trafficking violations.

So a narc was responsible for the 100-to-1 crack-to-powder ratio?

Yes. And later he turned out to be a perjurer and went to federal prison. He had lied for years about graduating from Howard University's School of Pharmacy and being a pharmacist. In preparation for his sentencing he provided some letters attesting to his good reputation from various figures in D.C., including judges. It turned out he had forged the letters he was submitting to the court to get a more lenient sentence!")

Inmates sentenced for drug offenses have an outsized impact on the population of the Bureau of Prisons. While only 31% of sentenced defendants are convicted of a drug offense, they comprise 50.1% of inmates in BOP custody.[11] During the debate over Amendment 782, a number of legislators recognized the relationship between the amount of drug offenders in BOP custody and the availability of recidivism prevention programs to inmates.

> We are confident that retroactivity will improve public safety. Indeed, public safety is most threatened by inaction. The Commission has a statutory duty to formulate the Guidelines to minimize the likelihood of Federal prison overcrowding. Yet today, Federal prisons are more than 30 percent over capacity overall, and high security facilities are 51 percent over capacity.
>
> This overcrowding places not only the lives of our prison staff and inmates at risk, but it reduces the availability and effectiveness of prison programming to reduce recidivism. The vast majority of Federal inmates will eventually be released. We owe it to the communities in which they will live, as well as

---

[11] Saris at 2.

to the inmates themselves, to provide the highest quality recidivism reduction and reentry services upon their release.[12] There are only so many dollars available to the Bureau of Prisons. Those dollars can go to warehouse elderly drug offenders or to recidivism reduction programs, but not to both.

Amendment 782 helps ameliorate the threat to inmate programs designed to improve community safety upon release. During hearings on the amendment, the Commission was persuaded that broad retroactive application of Amendment 782 would allow the Bureau of Prisons to refocus its resources on inmate programming. The

> Commission received testimony from the Department and other stakeholders that the amendment would permit resources otherwise dedicated to housing prisoners to be used to reduce overcrowding, enhance programming designed to reduce the risk of recidivism, and to increase law enforcement

---

[12] U.S. Senators Patrick Leahy, Richard Durbin, Rand Paul, and Sheldon Whitehouse, Senate Committee on the Judiciary, Letter to the United States Sentencing Commission, at 2 (July 7, 2014) available here. See also U.S. Representatives John Conyers, Jr. and Robert C. "Bobby" Scott, House of Representatives, Committee on the Judiciary), Letter to the United States Sentencing Commission, at 1 (July 7, 2014) ("Retroactive application of the amendment will save billions of dollars, ease overcrowding in federal prisons, and lessen the disproportionate impact that drug sentences have had on tens of thousands of people and communities of color.")

and crime prevention efforts, thereby enhancing public safety.[13]

In sum, there is a consensus among legislators, the Department of Justice, and the Sentencing Commission that broad application of Amendment 782 will improve community safety.

There is, on the other hand, no evidence that moderately shorter sentences will increase recidivism. Judge Saris recently summarized the research.

> [R]eal-life experience in the states, together with new academic research, has begun to indicate that drug sentences may now be longer than needed to advance the purposes for which we have prison sentences, including public safety, justice, and deterrence. Some prominent scholars have written that lengthy periods of incarceration are unlikely to have a deterrent effect and that even the incapacitation effect—keeping dangerous people off the streets—becomes less significant as prisoners get older.[14]

---

[13] Saris, supra note 3 at 21. See also Attorney General Eric Holder, Testimony before the United States Sentencing Commission, March 13, 2014, available here. ("The Commission's proposed Part B amendment to §2D1.1(c), lowering the base offense levels by two levels across drug types, is consistent with the Department's initiative and goals of controlling the prison population and ensuring just and proportional sentences for all offenders. ")

[14] Saris at 12.

The Government's argument that a life sentence is necessary to deter other crimes or protect the public lacks actuarial or empirical support.

A recent Sentencing Commission study underscores Judge Saris' observations. In 2007, the Commission reduced crack cocaine sentences by two levels under Amendment 706. A study was then conducted to determine if the defendants who received a sentencing reduction were more likely to recidivate than those who did not. The study concluded that there was no statistically significant difference between the two groups.[15]  This study demonstrates that the additional incapacitation achieved by longer sentences for the control group of crack cocaine offenders simply did not contribute to public safety.

This is particularly true for defendants like Mr. Verdin-Garcia who will be older when released. Mr. Verdin-Garcia was born in 1975.[16]

---

[15] United States Sentencing Commission, Recidivism Among Offenders Receiving Retroactive Sentence Reductions: The 2007 Crack Cocaine Amendment (May 2014), at 1-2, available here. ("[T]here is no evidence that offenders whose sentence lengths were reduced pursuant to retroactive application of the 2007 Crack Cocaine Amendment had higher recidivism rates than a comparison group of crack cocaine offenders who were released before the effective date of the 2007 Crack Cocaine Amendment and who served their full prison terms less earned credits.")

[16] PSR at 2.

His sentence computation date began when he was arrested and detained on February 25th of 2005.[17] Were the Court to reduce his sentence to 30 years, Mr. Verdin-Garcia would serve about 26.5 years if he earned all available good time credit. This would place his release date in late 2031, when he is 56 years old.

Defendants released at the age that Mr. Verdin-Garcia would be, should the Court reduce his sentence, recidivate at a fraction of the rate that younger defendants do. Crime, as Judge Posner recently observed, is generally "a young man's game." *United States v. Presley*, __ F.3d __, 14-2704 (7th Cir. 2015). In a recent report, the Office of the Inspector General studied the recidivism rates of inmates it defined as elderly.[18] The report concluded that those inmates released between the ages of 55 and 59 recidivate 16% of the time,[19] a stark difference from the national recidivism rate of 67.8%.[20]

---

[17] PSR at 3

[18] For purposes of the study, age 50. See e Office of the Inspector General, U.S. Dept. of Justice, "The Impact of an Aging Inmate Population on the Federal Bureau of Prisons," May 2015.

[19] OIG Report at 39.

[20] National Institute of Justice, Recidivism, June 2014, available here.

Given the dramatically reduced risk of recidivism posed by older inmates, continuing to incarcerate Mr. Verdin-Garcia into his sixties and seventies is unnecessary to safeguard the public. As Judge Posner continued,

> A sentence long enough to keep the defendant in prison until he enters the age range at which the type of criminal activity in which he has engaged is rare should achieve the aims of incapacitation and specific deterrence, while lengthening the sentence is unlikely to increase general deterrence significantly if the persons engaged in the criminal activity for which the defendant is being sentenced have a high discount rate; for beyond a point reached by a not very long sentence, such persons tend not to react to increases in sentence length by abandoning their criminal careers.[21]

The available evidence demonstrates little benefit to society from incapacitating Mr. Verdin-Garcia for the rest of his life. By the time he reaches his late 50's, Mr. Verdin-Garcia is unlikely to pose a threat to the public. But continuing to incarcerate him imposes direct costs for public safety by stressing the availability of recidivism reduction programs for other inmates.

---

[21] *Presley* at 8.

Finally, the Government relies on Mr. Verdin-Garcia's disciplinary history to argue against a sentencing reduction. This Court has already rejected the premise of the Government's argument. In *United States v. Shavar Walker*,[22] the Government asked the Court to deny Mr. Walker a sentencing reduction because of his post-sentencing conduct. Mr. Walker had been sanctioned six times in BOP custody, including incident reports for insolence, disruptive behavior, and the possession of drugs.[23] Rejecting this argument, this Court granted a retroactive sentencing reduction.

> The court also declines to follow the government's request that the motion be denied in its entirety because of disciplinary violations. Although very troubling to the court, the court concludes that these should not bar the defendant from relief. The court concludes that the Bureau of Prisons has adequate sanctions at its disposal to address violations, such as denial of good time and imposition of administrative segregation. If Mr. Walker's infractions were deemed serious enough, he could be prosecuted for any crimes he may have committed. But to deny the adjustment would ignore the underlying policy guidance of the Sentencing Commission that the large disparity formerly

---

[22] 2008 WL 2050853 (D. Kan. 2008).
[23] See *United States v. Shavar Walker*, 2:04-cr-20063-JWL, Doc 53.

prevailing in sentencing for crimes involving cocaine in its powder and base forms simply is not justified.[24]

The Court has staked the same position during the Amendment 782 litigation.[25]

## Conclusion

Undersigned counsel did not represent Mr. Verdin-Garcia during the district court proceedings in this case, and has no reason to quarrel with the Court's characterizations of his character and record at sentencing. This was a very serious crime, but it can be adequately punished with a thirty-year sentence. This Court should reduce Mr. Verdin-Garcia's sentence to 360 months.

---

[24] *United States v. Walker*, Document 58. Accord United States v. Ayala, 540 F.Supp.2d 676, 680 (W.D. Va. 2008) ("The government's last argument is that the defendant has behaved in such a manner in prison as to indicate that it would be dangerous to release him into the community. The government cites two incidents in prison-an "assault without serious injury" and "fighting with another person." Infractions in prison can be serious and may indicate that a defendant will disregard the rules and laws of the community. Accordingly, the Bureau of Prisons has the discretion to grant or withhold good time, giving some inmates the opportunity to eliminate fifteen percent of the total sentence imposed by the court. Nothing in my ruling today changes that. If the Bureau of Prisons has determined that the defendant's infractions warrant a reduction in his good time, then the defendant may be required to serve the entirety of his new sentence in prison. Furthermore, if the government decides that deprivation of good time is an insufficient penalty for an infraction, then it has the option of prosecuting an inmate for the crimes he committed in prison.")

[25] *United States v. Harris,* Case No. 07-20007-01-JWL (Doc. 173).

Respectfully submitted,

S/ Kirk C. Redmond
KIRK C. REDMOND  #18914
First Assistant Federal Public Defender
117 SW 6th Avenue, Suite 200
Topeka, Kansas 66603
Phone: 785/232-9828
Fax: 785/232-9886
Email: kirk_redmond@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2015, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following:

Sheri McCracken
Assistant United States Attorney
Sheri.McCracken@usdoj.gov

/Kirk C. Redmond
Kirk C. Redmond